Mr. Rosemarin. Thank you, Your Honor. May it please the Court, my name is Kerry Rosemarin. With David Peterson, I represent appellants William and Nancy Liebhart in their appeal of the District Court's second grant of summary to the District Court at 917 F 3952 which I shall refer to as SPX 1. In SPX 1, this court defined standards under the standards under the citizen suit provisions of the Resource Conservation and Recovery Act and the Toxic Act. The UE have used the term the mere risk standard to describe what this court's interpretation was of the imminent and substantial endangerment provision, that is the operative provision of the citizen suit provision under RCRA. In SPX 1, this court embraced the quote core content of other circuits, in particular U.S. fee price of the Third Circuit which stated that gives the District Courts the authority to issue injunctions that is prohibitory or mandatory when there is but a risk of harm, hence the mere risk standard. In SPX 1, this court also instructed litigants and the District Court on how to apply the mere risk standard and it said that the Liebharts must show that there are currently PCBs on their property which have the potential to substantially threaten their health and the environment. Can I ask you a kind of a pragmatic question? There's there's a lot that's been going on in this case of course over many years and your pictures are very telling with these clouds of dust that may well have PCBs in them but there is also a state plan out there. Could you just summarize for me in what ways you think that plan is deficient as a matter of law? Your Honor, yes. I refer the court to our figures 8, 9, and 10 in appellate docket 18 of at pages 24 through 26 of our opening brief that is appellate docket 18. In SPX 1, this court directed the District Court to determine whether SPX's state law plan quote adequately remedies the harms that may come within RCRA's scope. It does not and it does not because the state plan leaves in place PCBs on the surface that will definitely threaten the Leibharts health and the environment. The defendants refuse to comply with the binding PCB regulations which would cure that deficiency. Allow me if you will to refer to figure 8. I know you can't see it on zoom very well but this is you're talking about the one on page 24 which I am looking at. Yes, your Honor. Yes. Figure 24 shows the areas that the state plan will clean up. There's those three squiggly line areas which are the limit of the state law plan. Those may well be the tip of the iceberg of PCB contamination in the area. I asked the known contamination on the property to the north which the Leibharts own and the property to the north of that which is occupied. Both of those are occupied by residences. Now both of those... Although I understand not the Leibharts now. They've they moved out. That is correct, your Honor. That is correct. However, the Leibharts home, the northern half of the Leibharts home including the area that aerial photograph, those areas remain uninvestigated. Yet it's highly unlikely that PCBs would only remain, only be deposited by the demolition in those two areas. I also asked the court to now refer to figure 10. Figure 10 includes four samples, surface samples, across the street to the west of the Leibhart home. Those were, those samples contained surface samples of PCBs. That data was collected after the district court issued its first grant of summary judgment to defendants. So do you know exactly what year? I mean because of factor here as well. When were those four? I see the four red arrows. When were they collected? They were collected in May of 2018, your Honor. The district court's first grant of summary judgment was rendered on March 30th, 2018. Now comparing figures 8 and 10 and looking at figure 9, it seemed that this entire area is likely contaminated with toxic PCBs on the surface that are not totally enclosed and thus violate the totally enclosed standard of the toxic substances control, which states that PCBs that are not totally enclosed present an unreasonable risk of injury to health and the environment. That's under the statute at 15 U.S.C. 2605 E2 BNC. Now we maintain that even without expert testimony, an issue... This is the invisible Judge Easterbrook. I have a related question, which is what what is it concretely that you... Well there are still a few bugs in the system. Mr. Rosemary, what is it concretely that you think must be done? For example, if the defendant volunteered to put down an inch of fresh clean topsoil, would that do it? No, your Honor, it would not because the PCB regulations are so mandate in that although a remedy such as that might be available, I think they require three feet of clay to ensure isolation of the PCBs. Concretely, what is required is that the PCB regulations actually require... Counsel, I want to be clear. I'm not asking you for your interpretation of the regulations. I'm asking you concretely what your client wants. The reason I'm asking this is because it was important to the district court's opinion that there was no expert evidence showing what part of any PCB contamination was attributable to the defendant, or at least the recent activities, and what part was much, much older. When we start talking about three feet of clay, we're talking about remediating potentially much, much older contamination. So I'm interested in trying to... in asking you, finding out what it is concretely you want that will remediate the contamination caused by the defendant. What we are asking for is a complete investigation using the methods prescribed by the PCB regulations and a remediation as the PCB regulations require. That would likely require excavation. Now, if that excavation... Now, I hope you can see my problem. If what you want is excavation, it looks like what you're asking for is a remedy for much, much older contamination, which is awfully hard to chalk up to the defendant. I was hoping you would give me an answer that might be limited to dealing with the contamination plausibly caused by the defendant. That can be easily done, Your Honor. It's... Well, then, then don't talk to me about three feet of clay. Tell me what can be easily done to deal with the contamination plausibly caused by the defendant. Removal of one foot of soil, wherever contamination is found, Your Honor. That's completely different from three feet of clay. No, Your Honor, what I understood your hypothetical or your example to convey is that if you found a deep contamination, then that would not be excavated. But you mentioned several inches of soil on top. That did not include excavation. What I'm asking for is excavation of perhaps the top foot of soil. That would remove the area that would matter, the contamination plausibly caused by the demolition. As a matter of fact... So do we have expert testimony that would show that given the timing of this foot somehow corresponds to that? I mean, it seems like experts would need to opine on such a thing, as opposed to just judges. I think we have, I think that the SPX plan itself in those three areas calls for one foot of excavation. And additionally, we do have expert testimony because SPX's own expert, Dr. Russell, opined that, in fact, stated that in his report, and I can find the exact site, that demolition, that contamination found on the surface is from the demolition. And as a matter of fact, table two of the report shows that. 100% of the samples taken on the Leap Heart property, of the surface samples taken on the Leap Heart property, do contain PCBs. This is the one on page, just to be clear, you're referring to the table that is on page 17 of your brief? Yes, Your Honor. Okay. All right. Dr. Keenan's report is at District Court Docket 116, and at page 23 of 38 of the surface contamination indicates contamination from the demolition, Your Honor. As one might expect, an aerial deposition. Now, we do have expert testimony, and the experts have stated in SPX 1, the district court directed, excuse me, this court directed the district court to under the mere risk standard. But the district court failed to do that. Mr. Woodyard, John Woodyard, was the Leap Heart's expert for standard of care and causation. And he testified unequivocally that the demolition was the dominant cause of the contamination. He also gave rational explanations for the appearance of PCBs in 22% of the deeper samples. But could I just interrupt and say in Leap Heart 1, we said the district court was well within its discretion to exclude the proffered testimony of expert witness Woodyard. And so we were not certainly compelling the district court to change its mind about that on remand. That is correct, Your Honor. But in fact, the district court did choose to review Woodyard. It affirmatively adopted, reverted to its erroneous exclusion of Mr. Woodyard. On remand, it stated it adopted its initial exclusion, which claimed that Woodyard did not rule out alternative causes. But as Schultz Fiaxo Nobel at 721 F. 426 states, he did not have to rule out other causes because he unequivocally identified the dominant cause. The law of the Seventh Circuit is that where the standard of decision only requires a contributing cause and a dominant cause is identified, then there is no need to rule out other causes. That's Schultz. Now, there is an exception that it not only is that Schultz, that is the mere risk standard. That is the case before the court currently in Lee Park. Now, there is an exception not applicable here, as demonstrated or as exemplified by Brown v. Burlington Northern 765 F. 3rd 765, which states that the expert must rule out alternative causes if those alternative causes have the power, if you will, if if they can displace the dominant cause. That is not the case here. The fact that there is PCBs maybe in the deep samples can in no way displace or eliminate the possibility that the demolition, in fact, the dominant cause being the demolition. In other words, both can coexist. Let me explain the difference between the Leapfrog's position and the defendant's position. The Leapfrog's alleged that virtually all the contamination is from the demolition. The defendants simply argue that some of it was historic. Well, you don't you don't seriously assert that all of it is. I thought that the Leapfrog's were making the more modest claim that with the demolition came deposition of particulate material on the surface of the grass or the driveways or cars or wherever it was being deposited that was contaminated with PCBs. And so that added to whatever was there. If what was there before was zero, it added to zero. If what was there before was a positive number, it added to that. So surely the Leapfrog's aren't saying that every sign of PCB on the properties is attributable to the to the demolition. Leapfrog's are saying that all of the contamination found on the surface, Your Honor, is from the demolition. And there's contamination, say, underneath the asphalt driveway. Don't I recall that correctly? Yes, there is that that seems to have assumed an outside place in this analysis because Mr. Woodyard testified that contamination at depth can be caused, for example, by cross-contamination when the instrument is goes down into the soil that can carry contamination from the surface. That can happen whether it is the surfaces covered by asphalt or not. That's really immaterial, Your Honor. So could I ask you this? If we were to conclude that the district court was entitled to continue to reject Woodyard's expert testimony, where would that leave you? We would still satisfy the mereest say, Your Honor, because our analysis shows that with or without expert testimony, there is the merest standard is satisfied. That is, PCBs on the surface of the Leapfrog's property that have the potential to threaten their health. Let me go through the undisputed non-expert evidence that demonstrates that. We've already referred to the dust clouds of dust. Now, could that dust contain PCBs? The data clearly show that it does. Number one, the surface of the substrate or the subject of the demolition, 67 percent of the dust on top of the concrete floor contained PCBs. But could I just ask, this demolition happened in 2015, right? So the Leapfrogs aren't saying that new PCBs are being deposited, are they? I thought it was just what to do with what got left on the surface of the land or a little below it after 2015. Is that right? No, the Leapfrogs are asserting that the demolition disturbed the PCBs, did not control, caused uncontrolled discharges of PCBs as a result of the demolition equipment hitting the contaminated surfaces, particularly the concrete floor. That concrete floor had PCB contaminated dust on top of it. And the concrete floor itself, the top inch of the concrete floor contained, 75 percent of it contained PCBs. So we are the the demolition caused new disposal of unlawful disposal of PCBs onto the surface of the land in 2015 during the demolition, right? And that's shown by, as you referred to earlier, your honor, in table two. And as I mentioned, 100 percent of the surface of the surface soil data in table two contained PCBs. Seventy five percent of that exceeded the Wisconsin residential standards and 38 percent of that exceeded the federal standards. Now, previously I mentioned the the source of the sample. First of all, that was clearly from the demolition, as indicated by Dr. Stolzenberg's analysis of chromatograms. Chromatograms are essentially chemical fingerprints. Dr. Stolzenberg stated and concluded based on his analysis, it was the same stuff. Now, did those contamination, did that contamination have the potential to harm the Leap Heart's health? The answer is yes, it did, because the Wisconsin standards, it did as a matter of law. The Wisconsin standards under Wisconsin Administrative Code NR 720.01 are promulgated based on the protection of health, safety and the environment, and exceeding those standards, resting on the top, unenclosed on the top of the Leap Heart's backyard, clearly have the potential to harm them. Similarly, as I noted, the federal standards derive from the Toxic Substances Control Act. PCBs were banned by the Toxic Substances Control Act because of their extreme toxicity and PCBs that are not totally enclosed present an unreasonable risk of injury to health and the environment. I think I gave you the correct site before, but it's 15 U.S.C. 2605E2BNC. Essentially, the totally enclosed standard is a twin of the mere risk standard and PCBs resting on the top of the Leap Heart's residential backyard are not totally enclosed and therefore present an unreasonable risk. Conclusion is that based on the non-expert evidence, undisputed as a matter of law, the mere risk standard is violated, if you will. The PCBs clearly have the potential to harm the Leap Heart's health. At this point, Your Honor, I also wish to address the district court's error in excluding Dr. Carpenter. Dr. Carpenter's testified that indeed the Leap Heart's, the PCBs have the potential to harm the Leap Heart's health. The district court erroneously simply reverted to its original basis of exclusion of Dr. Carpenter, which was that he testified there was no safe level of PCBs. His testimony initially was just like that in Schultz, the expert in Schultz. However. The crux of the matter is that the district court. Did not apply the mere risk standard. Dr. Carpenter directly answered the question of whether the PCBs could on the Leap Heart's property could harm their health. And he did so by identifying the exposure pathway. He stated that the PCBs and the particulates deposited on the Leap Heart's health pose a threat of exposure by inhalation, ingestion and dermal absorption. That's at the lower court docket 118 at page 22. Additionally, Dr. Carpenter testified that those exposures were, quote, high exposures and asked what he meant by that. He testified that he was referring to the exceedances of the Wisconsin residential standards. That said, his transcript is at lower court docket 94 at page 42. So the conclusion is that with or without expert testimony, both we can conclude that the PCBs on the Leap Heart's property from the demolition have the potential to harm their health. And clearly, the state plan does not cure that ill because it leaves contamination in place. It leaves known contamination in place. And the district court also noted in its opinion that the Leap Heart's, that SPX, the defendants were not required to comply with the binding PCB regulations under TSCA. We submit that the district court does not have the authority to simply excuse the defendants from compliance with binding federal law. At this point, I request that reserve the remainder of my time for rebuttal. Thank you. Thank you. Mr. Splitek, Matt Splitek, your honor. You may proceed. Thank you. And I'm arguing today on behalf of SPX Corporation as well as its co-appellee in the case. This case, of course, is back a second time in this court after a remand for reconsideration of specific issues. The district court followed this court's instructions on remand. It properly exercised its discretion in excluding expert testimony and it correctly applied this court's rulings in concluding that Leap Heart's RCRA and TSCA claims both failed on multiple grounds. I'd like to start with John Woodyard. But I think the key point there is that the arguments the court just heard about John Woodyard are the same arguments that were made in the first appeal. In the district court's initial decision, the district court correctly concluded that Mr. Woodyard did not conduct any analysis to rule out or even examine. Much less rule out alternative causes of contamination at any level of soil depth, not just soil eight inches or below, but surface soil as well, which is soil below the root down to six inches. Mr. Woodyard admitted that runoff or erosion could have accounted for virtually any of the contamination on the Leap Heart's property. He conducted no analysis of the history of the property. He did not even interview the Leap Hearts before submitting his report. That is among the reasons why the district court excluded his testimony in the 2018 decision. And then this court affirmed that decision as well within the district court's discretion. So, Mr. Schlichtek, just as a point of clarification, this record does not contain, does it, suggestions of other sources for these PCBs? Were there other factories? Were there, you know, paper, carbonless paper? You know, is the record just silent about that? And I assume you mean sources other than the SPX facility? Right. The demolition was right. Yes, Your Honor, and I think for purposes of this case and this appeal, really, the question is whether contamination can be attributed specifically to the demolition. But looking more broadly, defendants believe, and there is evidence discussed in both Mr. Keenan's expert report and then also in an expert report submitted by TRC that the Leap Hearts, they brought in film materials from outside, which I believe Mr. Leap Heart agreed to during his deposition. And then as well in the TRC expert report, I believe it was Miss Carrillo Sheridan. There, in fact, is historical evidence that the Leap Hearts, well, not the Leap Hearts, but a former property owner stored amusement park equipment on that property as well historically. So we don't agree that all the contamination could be attributed to the SPX property, whether historical or otherwise. Thank you. The question with respect to Woodyard on remand was whether the district court would want to rethink its evaluation of Woodyard in light of this court's opinion. It wasn't required to do that. It still did look at whether its evaluation would be any different in light of this court's opinion. It concluded that it would not. And the Leap Hearts have no basis to complain about that because the Leap Hearts offered no argument as to why the evaluation should have been any different in light of this court's opinion. The arguments that were being offered and are being offered are the same arguments that, in fact, we discussed during oral argument two years ago in this court. And the exclusion of Woodyard on its own is enough to sink both the RCRA and the TASCA claims. Under to support their RCRA claim, the Leap Hearts needed to prove three different things. One, that the demolition contaminated their property with PCBs. Two, that exposure to those PCBs would have the potential to substantially threaten their health if they were to reoccupy their property. And then three, that the injunction they sought would be necessary to remediate that danger if it, in fact, existed. So can I ask you about one? Because there are these pictures in the record of giant plumes of demolition, which is hardly surprising given the demolition of that size. And there's evidence that PCBs were on the SPX site. And I'm just wondering, what homeowners are going to go have prophylactic PCB tests made on their property for the before time, just in case somebody decides to demolish something later? Isn't the evidence on point one at least good enough to allow the inference that PCBs were deposited there from the demolition? Uh, no, I don't think that there is any evidence to support anything but speculation that the dust contained PCBs. And in fact, I will note those photographs, we don't agree that the photographs even contain dust. The actual testimony in the record when witnesses with personal knowledge were asked was that photographs that the Leibartz and their attorneys say depict dust, in fact, depicted mist from misting machines. But even assuming dust migrated to the property, that is not sufficient evidence to support an evidentiary based inference that the dust contained PCBs. The Leibartz did have surface samples, true surface samples taken inside their property by a consultant after the demolition. And those surface samples turned up negative. And the Leibartz were concerned. And also, there was a blood serum sample test done of Mr. Leibart. And fortunately, that also turned up negative. So, on TASCA, to support their TASCA claim, the Leibartz similarly needed to show three different things. In that case, first, that a material with at least 50 ppm PCBs was spilled on their property as spill is defined in the PCB spill cleanup policy. Second, that the injunction they sought is an available remedy in a TASCA citizen suit. And then third, assuming it had been an available remedy, that it also would have been appropriate within the district court's equitable discretion. Can I go back for a second just to that first point? Because I'm reviewing just remembering that the Leibartz did present some evidence that there were PCBs in surface samples. And we do have this table that we've been referred to a couple of times. And there's also the chromatogram suggesting it's the same type of PCBs as those on the SPX site. So, I know that this one factor is not in itself enough to carry the day. But it's a building block. And it looks to me like a reasonable jury could conclude that this activity on the SPX site deposited PCBs. Those particular PCBs. And let me take both the surface samples and the chromatogram in turn. I do not agree that there is evidence to support a reasonable inference that any of the contamination on the property is attributable to the demolition. The surface samples and surface sample, I think that what we're looking at is surface soil. So, what about, maybe you could talk about table two. These are April and May 2015 surface soil samples. Is there something wrong with how deep they were going or how shallow they stayed? Or, you know, what in your view undermines these numbers? Which show some pretty significant concentrations. Yes. So, the samples are taken in soil. And these are not samples on the surface of the ground where people are walking around. These are underground samples still, even though they rise to the root level underground. So, that's six inches? You wouldn't call it a surface sample if we're deeper than six inches? If it's deeper than six inches, it is not surface soil. Right. Okay. That's correct. I just wanted to clarify. Yes. So, the fact that there is contamination in the surface soil, the first six inches of soil underground, is not enough to sustain a reasonable inference that that contamination can be attributed to any particular source. Mr. Woodyard himself agreed that virtually any of the contamination could be attributable to historical runoff or erosion. There was testimony by Mr. Liebhardt that he moved soil around the backyard, redistributed to, in fact, the very areas where contamination was found in high concentration, that he rototilled as well and conducted other activities that moved subsurface soil up toward the surface. What would be needed to determine whether any of that contamination can be attributed to the demolition or any specific source is an expert analysis to try to disaggregate the different alternative causes, and Mr. Woodyard just did not conduct that analysis. On the chromatogram, I don't want to neglect to answer that as well. The chromatogram, all it did, it was a fairly rudimentary analysis of the two different PCB samples. It could not rule out the possibility that the PCBs came from the same source. It did not conclude that the PCBs did come from the same source, and even if the PCBs had come from the same source, that still does not address when they were transported to the Liebhardt's property. Without Woodyard's analysis, for really the reasons we were just discussing, the Liebhardts cannot meet the first requirement that they needed to show under either their RCRA or their TASCA claims, and I think a decision affirming the district court need not go any further than that. I'm still, of course, going to turn to other issues, and I'll start with David Carpenter. The district court did exactly what this court asked it to do with Carpenter. It reevaluated Carpenter's assertions under this court's imminent and substantial endangerment standard. It quoted that standard three different times in its decision. It is not true that the district court reverted back to its previous analysis of Dr. Carpenter. It is not true that the district court excluded all of Dr. Carpenter, offered an unsupported opinion, that there was no safe level of exposure. Are you really arguing, though, that, say, the Wisconsin level, which, what was that, the 0.43, doesn't represent a legislative finding that PCBs in that concentration are indeed injurious to human health? I mean, the state doesn't just throw around these numbers for fun. Yes, I think it would be an error to link the residential cleanup standard in the Wisconsin regulations to the imminent and substantial endangerment standard under RICRA. Why is that? I mean, it seems to me that the state is trying to say that there's a significant risk to human health if it goes above this, and therefore, that's where we intervene, and you've got to clean up in appropriate ways. The concentration of contamination in the soil does not answer the question, how much PCB exposure would the Liebhards face if they were to reoccupy their property? And it does not answer the question how that unknown level of exposure links to or does not link to levels that have been determined to be harmful in the scientific. Okay, so if I understand you, you're saying that there needs to be one more step in the evidence, which is to say that if there's this much, let's say the 0.43 in the soil, then some amount through ordinary human occupation aerosolizes again or somehow gets back in the air, maybe you can't grow vegetables in your garden or something, I don't know, that there's some way it moves from the soil into the human body. Yes, the Wisconsin DNR is not saying that as a matter of law, every time there is a concentration of PCBs above the residential cleanup standard, that there is what the court should consider a substantial and imminent endangerment. Do you have a case that says that? I mean, it seems like an aggressive proposition to me. There are actually, I do, there are three things I'd like to point the court to. First, in the first Leibart opinion, I believe this court held that it is not sufficient for the Leibarts to simply show that there is some portion of their soil that has contamination above the cleanup standard, whether the state cleanup standard or the higher federal cleanup standard, for that matter. Second, I would direct the court to the Second Circuit's Simsbury-Avon case. I believe the site should be pages 212 to 214, as well, for authority that exceeding a state's cleanup level, regulatory level, is not on its own sufficient to demonstrate a substantial and imminent endangerment. Third, in our brief, we cited an email that a Wisconsin DNR toxicologist sent to Mr. Leibart saying that even at levels far exceeding the residential cleanup standard, it was more PCB contamination than the DNR wanted to see, which is why it's going to be remediated, but not high enough to make people or animals sick. And that is cited in our brief, and I'm sure I could find the exact page if necessary, but it is there. And that was the fundamental problem with Dr. Carpenter's report. That is what the district court focused on on remand. Dr. Carpenter did not use any methodology to analyze how much PCB exposure the Leibarts would even face if they were to reoccupy their property. He agreed that he did not seek the information that might have been useful for that analysis, such as a PCB air sample test. And so having not conducted that analysis, Dr. Carpenter also did not link the Leibart's unknown level of exposure to levels that have been determined to be harmful in the scientific literature. So the district court was well within its discretion to exclude Dr. Carpenter's testimony, just as it was Mr. Woodyard's. And Dr. Carpenter's exclusion is the second reason that the Leibart's RCRA claim fails. Without Carpenter, the Leibarts could not meet their second requirement to support their RCRA claim. The Leibarts could not show that the PCBs on their property have the potential to substantially threaten their health if they were to reoccupy their property. And that is regardless of where the PCBs came from. So you think that somebody should be able, I mean, you think it's enough if they reoccupy, let's say the house, as long as they don't, you know, rake the leaves or garden or in any way disturb the soil around their house? That seems like a substantial diminishment in one's ability to enjoy one's own property and make use of it. No, our case here, it's not that the Leibarts, no one is contending that the Leibarts would have to reoccupy and use specific behaviors or whatnot. There is no evidence to support an inference that if the Leibarts reoccupy their property and do whatever they want to do, that they would be exposed to levels of contamination that have been determined to be harmful in the scientific literature. I.e., those levels that are reflected in the state standards, I would say. So, you know, Dr. Carpenter, we've had this kind of problem before, isn't sure that there's a low limit on when PCBs stop being dangerous. Now, maybe we can all intuit that there is, but if the case in front of us shows PCBs in excess of the state standard, we don't really need to worry about what the floor is, do we? I think that, well, first, we don't agree, and I won't belabor it, but I've given the citation. Right, right, no, I understand that. Thank you. The court does not need to determine any specific floor. I think the important points are, number one, there was no evidentiary basis for Dr. Carpenter's opinion that there is no safe level of exposure to any— Do you think that in every case dealing with PCB contamination, it's the plaintiff's burden to begin from sort of the big bang and show why PCBs are, in fact, a dangerous substance? There's a lot of governmental regulation. There's a lot of literature about that. Do you think that's an adjudicative fact that needs to be found in each case? I think it is the plaintiff's burden to show that the particular contamination that they complain of could substantially threaten their health. So if the case were about arsenic, you would think the plaintiffs would have to show that arsenic is unhealthy for people? I mean, aren't there some things that are just established through appropriate government sources and regulations that we start from the proposition that they're dangerous at some level? I think the question is not whether PCBs are healthy or unhealthy. They're not healthy to regulate. I hope not, yeah. Yes. Nobody wants to add more of them to their property. But the question is whether there is enough contamination that the Leibartz would face, enough exposure that there would be a substantial threat to their health if they were to reoccupy their property. And they do not have the evidence to support that inference. And that is their burden. There are still other reasons, too, unrelated to expert testimony that both the RCRA and the TASCA claims fail. For RCRA, the Leibartz also cannot meet their third requirement of showing that the injunction they sought would be necessary to remediate any danger if they could show that one existed. And that is because SBX and TRC are already working with Wisconsin DNR and the EPA as well to remediate that property. And the Leibartz did not offer the district court any evidence that it would be necessary to stop that remediation and to remediate it in the way that they wish to instead. And I should address, there were some exchanges about different figures in the plaintiff's brief. On figure 9, those samples showed contamination below the Wisconsin residential cleanup standard. That is why they weren't encompassed within the boundary where there would be cleanup. Figure 10, the samples across the street, which the Leibartz did not argue on their post-remand summary judgment briefs. What the Leibartz are trying to do there is to take advantage of the fact that the remediation, it has always been, as I think we said in our brief, an iterative process that calls for further sampling and excavation. Those samples were put into the sampling plan at the request of the Wisconsin DNR. They, by the way, showed contamination below the federal residential cleanup standard. And the plan from the beginning has said that there will be sampling, there will be excavation, there will be verification sampling, and there may be further excavation as well, depending on what the sampling shows. So the fact that the plan is proceeding as planned and samples are being taken and some of those samples show contamination, in this case below the federal cleanup standard, is not evidence that there's anything deficient about the plan. And then for TASCA, there are multiple additional reasons that the claim fails. One is that there cannot be a spill of a solid substance under the PCB spill cleanup policy, which is plain from the text of the policy, as we discussed in our brief, and is right on the EPA's own website that the policy is intended to apply to liquid spills. This court has already ruled that mandatory injunctions are not available in the TASCA citizen suit. And then I will say there are particular problems as well with the Leibovitz trying to force the terms of the PCB spill cleanup policy into a court order. It's an enforcement policy that establishes criteria for EPA. EPA retained discretion, flexibility to approve alternative measures on a site-specific basis, and it specifically warned in the text of the policy against mechanically applying the policy in other contexts. And I have run out of time. I'm happy to take questions if there are any, but otherwise I will figuratively take my seat. Thank you. Mr. Rosemarin, your time had almost expired, but you may have a minute to rebut briefly if you have some concluding thoughts. Thank you, Judge Sykes. Yes. Initially, I want to add the point that the vegetable garden sample shows conclusively that the demolition could only have come, that the contamination could only have come from the demolition. That is undisputed. That was in an area that was not overturned by Mr. Liebhardt with any tilling of soil. Additionally, the interfaith decision of the Third Circuit guides us here very well. That was the core content that the Seventh Circuit adopted. Interfaith shows that notwithstanding the existence of an inadequate state plan, in this case, one that discards the binding federal regulations, that interfaith states that based on the exceedances of the standards itself, that is all that is needed to satisfy the MIRIS standard. Thank you very much. All right. Thank you very much. Thanks to both counsel. The case is taken under advisement.